IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>FORKLIFT LP CORPORATION f/k/a<br>CLARK MATERIAL HANDLING COMPANY,<br>et al., | ) Chapter 11<br>) Bk. Case No. 00-1730 (LHK)<br>) Jointly Administered<br>) |
| FORKLIFT LIQUIDATING TRUST<br>as successor in interest to<br>FORKLIFT LP CORPORATION f/k/a<br>CLARK MATERIAL HANDLING COMPANY,<br>et al., | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) Civ. No. 02-946-SLR<br>) Civ. No. 02-1018-SLR |
| CUSTOM TOOL & MFG. CO. | ) |
| Defendant. | ) |

Eric L. Schnabel, Esquire and Jennifer M. Becnel-Guzzo, Esquire of Klett Rooney Lieber & Schorling, Wilmington, Delaware and Lori A. Dawkins, Esquire of Klett Rooney Lieber & Schorling, Pittsburgh, Pennsylvania. Counsel for Plaintiff Forklift Liquidating Trust.

Margaret M. Manning, Esquire of Buchanan Ingersoll PC, Wilmington, Delaware. Counsel for Defendant Custom Tool & Manufacturing Company.

**OPINION**

Dated: March 31, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

On April 17, 2000, Clark Material Handling Company and several of its affiliates (collectively "Clark") filed a petition seeking protection under Chapter 11 of the Bankruptcy Code. Plaintiff Forklift Liquidating Trust ("plaintiff") is successor in interest to Clark. Plaintiff filed the instant litigation against defendant Custom Tool & Manufacturing Company ("Custom Tool") seeking to avoid a total of $1,362,936.24 of alleged preferential transfers pursuant to 11 U.S.C. § 547.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. A bench trial was conducted on January 3, 2005. The findings of fact and conclusions of law required under Fed. R. Civ. P. 52 follow.

## II. FINDINGS OF FACT

1. For many years prior to its bankruptcy, Clark had been a manufacturer of material handling equipment, most notably forklift trucks.

2. Custom Tool has been a manufacturing company located in Lawrenceburg, Kentucky, for over 25 years.

3. In the late 1980's, Custom Tool began to sell parts, including steer axles, to Clark for Clark's use in the manufacture of forklifts.

4. Custom Tool's established procedure for billing its customers was to submit an invoice to the customer on the same

day it sent the customer parts. The terms of the invoices were typically "Net 30", which meant that the invoice was payable within 30 days of its receipt. In keeping with its invoicing procedures, Custom Tool invoiced Clark on the same day it sent Clark parts with invoice terms of Net 30. This practice was consistent throughout Custom Tool's relationship with Clark prior to the bankruptcy. After Clark filed for bankruptcy protection, Custom Tool changed its terms to cash on delivery, or "C.O.D.".

5. In the years prior to 1999, Clark paid its invoices timely.[1]

6. By 1999, Clark was in financial straits and experiencing problems with cash flow. Clark began conducting weekly cash management meetings in mid to late 1999 to determine which vendors it had to pay in order to keep its manufacturing operation running. (D.I. 22 at 18-20) By 2000, these cash management meetings were being held on a daily basis as Clark was able to pay only those vendors that were threatening to stop shipping and whose goods Clark needed in order to manufacture forklift trucks. (D.I. 22 at 21, 89) More specifically, the evidence of record demonstrates that Clark

> would not pay a vendor unless [it] needed

---

[1] During discovery, Custom Tool failed to provide invoices predating May 1999. Therefore, the court will assume that the parties' payment history, pre-May 1999, was conducted in accordance with Custom Tool's established Net 30 procedure, despite testimony to the contrary. (See D.I. 22 at 53-54)

2

>    product and so what would happen is since
>    . . . virtually all of [its] vendors were
>    screaming, each payment was really a
>    negotiation, and so [Clark] needed to find
>    out how much it was going to cost you to
>    release X amount of dollars of product.  And
>    [Clark] needed that product either to build
>    a truck or to fill a parts requirement.  So
>    each payment was a result of a negotiation
>    of some point.

(D.I. 22 at 102)  This was true of all the vendors that were paid.  (D.I. 22 at 102-103)  Custom Tool was considered to be an important vendor whose product was needed to keep Clark's manufacturing operation running.  (D.I. 22 at 24)

  7.  Based on the evidence of record,[2] invoices sent to Clark from Custom Tool commencing mid-March 1999 through February 2000 were not paid within 30 days, but generally were paid within 60 days.  Starting in mid-May 1999, the number of invoices paid in over 60 days increased, ranging from 41 to 273 days with an average of 60.4 days from invoice to payment.  Within the preference period, the range of days was 32 to 219 days with the average days to pay being 55.5.  The mean for this entire period of time remained 60 days or less.  (DX 2, 3)

  8.  The majority of Custom Tool's customers paid on time.  (D.I. 22 at 74)  For the few customers who paid late, Custom Tool's normal collection practices involved Dave Dillon, the

---

  [2]Custom Tool presented payment information only for invoices presented to Clark from mid-March 1999 through February 2000. (DX 2, 3)

accounts receivable manager, calling the customer. (D.I. 22 at 55) In rare cases, when Mr. Dillon's collection efforts were unsuccessful with a delinquent local customer, Rodney Cunningham, Custom Tool's president, paid a personal visit to the customer. (D.I. 22 at 55, 79)

9. Sometime in the months preceding the petition date, Mr. Cunningham personally visited Doug Bennett, Clark's CFO, in order to discuss payment. (D.I. 22 at 24, 57, 92)[3]

### III. CONCLUSIONS OF LAW

1. Under 11 U.S.C. § 547(c)(2), an "ordinary course defense" or "ordinary course exception" is available to a creditor and permits the creditor to retain transfers made by the debtor to the creditor during the preference period[4] if three requirements are met: (1) such transfers were made for a debt incurred in the "ordinary course of business" of the parties; (2) the transfers were made in the "ordinary course of business" of the parties; and (3) the transfers were made in accordance with "ordinary business terms".

2. In order to successfully utilize the ordinary course defense, the creditor must prove by a preponderance of the

---

[3] Although Clark personnel testified at trial that Mr. Cunningham demanded payment during this visit and was, in fact, paid as a result, there is no evidence of record relating a visit with a substantial payment.

[4] The preference period is the 90 days preceding the filing of a petition in bankruptcy.

evidence that the preferential period transaction between creditor and debtor meets the three subparts of § 547(c)(2). The three subparts must be read in the conjunctive. J.P. Fyfe, Inc., of Florida v. Dradco Supply Corp., 891 F.2d 66, 69-70 (3d Cir. 1989).

3. The preference rule and its ordinary course exception are designed to balance the interests of the debtor and creditor. As the Third Circuit has explained:

> On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

In re Molded Acoustical Products, Inc., 18 F.3d 217, 219 (3d Cir. 1994). To put the point differently, the ordinary course exception offers an incentive for creditors to maintain a constructive relationship with debtors. "[W]hen the relationship in question has been cemented long before the onset of insolvency - up through and including the preference period - we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping

5

bankruptcy and continuing in business." Id. at 224-225.

4. To meet the § 547(c)(2)(A) requirement, the transaction need not have been common, it need only be ordinary. The debt must have been incurred in an ordinary manner, based on its consistency with other business transactions between the parties. In re Valley Steel Corp., 182 B.R. 728, 735 (Bankr. W.D. Va. 1995). A transaction can be ordinary while still occurring only occasionally between the parties. J.P. Fyfe, Inc., 891 F.2d at 68.

5. The court finds that Custom Tool has satisfied its burden to prove that the transfers at issue were made for debts incurred in the ordinary course of business.

6. The determination of whether a creditor has met its burden under § 547(c)(2)(B) is a subjective test which considers the consistency of transactions between the debtor and creditor before and during the preference period. In re First Jersey Sec., 180 F.3d 504, 512 (3d Cir. 1999); see also J.P. Fyfe, Inc., 891 F.2d at 71. In determining whether payments were made in the ordinary course of the parties' dealings, courts consider such factors as: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to be an unusual action by the debtor

or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.  In re Parkline Corp., 185 B.R. 164, 169 (Bankr. D. N.J. 1994).  Where the parties have a long history of dealings, the focus is on those dealings; where the parties have a short history of dealings, the creditor is required to fill the "gap" by reference to a more extensive and exacting analysis of industry standards.  In re U.S. Interactive, Inc., 321 B.R. 388, 392-93 (Bankr. D. Del. 2005).  By itself, lateness of payment does not preclude a finding that the payment was made in the ordinary course; a pattern of late payments can establish an ordinary course between the parties.  In re Big Wheel Holding Co., 223 B.R. 669, 674 (Bankr. D. Del. 1998).  Extraordinary collection efforts can bring payment efforts outside the ordinary course of business even when a differing payment interval alone is not enough to do so.  In re Molded Acoustical Products, Inc., 18 F.3d at 228.

  7. The court concludes that Custom Tool has not satisfied its burden to prove that the transfers at issue were made in the ordinary course of business of the parties.  Although Custom Tool relies on the long payment history between the parties to demonstrate that the course of dealing during the preference period was not out of the ordinary, Custom Tool failed to present

such evidence, instead presenting only the year preceding the preference period. Without such evidence, the court cannot determine whether the transfers at issue were made in the ordinary course of business between the parties.

8. The third prong of § 547(c)(2), subpart (C), involves an objective test regarding the billing practices generally within the relevant industry as opposed to the subjective test relating solely to the dealing between the parties set forth in the previous discussion of subpart (B). In re Sacred Heart Hospital of Norristown, 200 B.R. 114, 116 (Bankr. E.D. Pa. 1996). A creditor has no affirmative defense to a § 547(b) avoidance action unless it is proven that the preferential transfers at issue were made "in harmony with the range of terms prevailing as some relevant industry norms." In re Molded Acoustical Products, Inc., 18 F.3d at 226. The Third Circuit has adopted a "sliding scale" approach to compliance with the industry standard. Id. at 224. Thus, the creditor is not required to prove rigorous definitions of either the industry or the credit standards within that industry. The creditor must establish, however, a "range of terms" on which "firms similar in some general way to the creditor" deal. Id. The court, therefore, is directed to make three inquiries in this regard. First, the court must consider "the range of terms on which firms comparable to [the creditor] on some level provide credit to firms comparable to the debtor on

8

some level." Id. at 227.  Second, the court must consider "the length of the parties' relationship predating the debtor's insolvency to estimate the size of the customized window surrounding the industry norm which was established in the first step." Id.  Finally, the court inquires "whether the relationship remained relatively stable leading into and throughout the insolvency period." Id. at 227-228.

9. The court concludes that Custom Tool presented no evidence at all concerning the billing practices generally within the relevant industry.  The testimony of Mr. Cunningham as to Custom Tool's billing practices with other customers does not satisfy this requirement.  Although the court finds it difficult to reconcile the fact that debtor continued to order parts from Custom Tool to survive, yet declines now to pay Custom Tool for its services, nevertheless, the statute and related case law require a certain quantum of proof, and Custom Tool has failed to provide such.

**IV. CONCLUSION**

For the reasons stated, the court shall enter judgment in favor of plaintiff and against defendant.  An order shall issue.